UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JILES WHIPPLE,<br><br>Defendant. | 3:23-CR-30024-RAL<br><br><br>OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION |

Defendant Jiles Whipple seeks to suppress the results of a blood sample that he alleges resulted from an unconstitutional search of his person. He also seeks to suppress statements he made to law enforcement, claiming they were involuntary and obtained in violation of Miranda. For the reasons explained below, Defendant's Motion to Suppress, Doc. 27, is denied.

**I.     Factual Background**

In the late afternoon of May 28, 2022, a silver car driven by Whipple struck Thomas Molina Sr.'s maroon pickup truck in an apparent T-bone style collision at the intersection of BIA 1 and Firekeeper Street in Rosebud, South Dakota. ST at 7, 22. Molina's five-year-old son had been riding in the bed of the pickup and was ejected and killed. Id. at 22. Rosebud Sioux Tribal Law Enforcement Service (RSTLES) officers responded to the scene to find Molina Sr. fighting and kicking Whipple. See Ex. 3 at 18. Rosebud Ambulance Personnel transported Whipple to the Rosebud Hospital for medical evaluation and treatment of injuries caused by the accident and the subsequent assault. Id. at 18; ST at 23.

1

While at the scene of the accident, tribal law enforcement learned that Whipple may have been intoxicated while driving. RSTLES Sergeant Dusty Old Lodge informed RSTLES Special Agent Mark Kettell that containers of alcohol were found in Whipple's vehicle. ST at 22–23. Kettell instructed RSTLES Officer Ramon Marrufo to obtain a blood sample from Whipple. Id. at 23. Marrufo took two new blood tubes to the Rosebud Hospital, where Whipple had been transported, but did not stay to collect the sample or obtain Whipple's consent. Id. at 8.

After learning that Marrufo did not stay to obtain the blood sample, Kettell went to the hospital himself. Id. at 23. When he arrived at Whipple's room to discuss the blood sample, Whipple was being treated by a nurse. Id. Kettell identified himself as a police officer and told Whipple that he wanted to obtain a blood sample to test for intoxicating substances like alcohol. Id. at 24. Kettell informed Whipple that he did not have to consent to a blood test, and Whipple consented to one anyway. Id. The nurse treating Whipple's injuries drew the blood samples. Id. at 25. At the suppression hearing, Kettell described Whipple as alert, communicating effectively, and willing to cooperate throughout their entire interaction. Id. at 24. The blood samples were ultimately sent to the South Dakota Health Laboratory for testing.

Later that evening, Sergeant Old Lodge informed the hospital that Whipple was to be held until he could be discharged into police custody. Ex. 4 at 4. Once hospital staff informed Old Lodge that Whipple had been cleared for discharge, RSTLES dispatched Marrufo to formally arrest Whipple and transport him to the Rosebud Sioux Tribe Adult Correctional Facility. Id.; ST at 12, 13. At the suppression hearing, Marrufo testified that Whipple's demeanor during the arrest and transfer appeared normal. Marrufo recalled that Whipple was alert, walking on his own, and speaking clearly. ST at 13; Ex. 8. Marrufo observed Whipple talk with his sister, who was present at the hospital, and other family members over the phone. ST at 13; Ex. 8.

The next day, Kettell interviewed Whipple at the Adult Correctional Facility. Ex. 3 at 19. Kettell began the interview by introducing himself as a police investigator. Ex. 11 at 1. Whipple said that he recognized Kettell from the hospital the day before. Id. Kettell then asked whether Whipple's injuries would prevent the two of them from talking. Ex. 11 at 2–3. Whipple replied, "No. I can talk." Id. at 3. Kettell then read Whipple the tribal advice of rights form, ST at 33–34, which lists individually, in separate paragraphs, a defendant's Miranda rights, Ex. 6.

After Kettell finished reading the advice of rights, Whipple, who was 18 at the time, asked if he was "able to call [his] dad." Ex. 11 at 3. Kettell told Whipple he could not because phone calls are left "all up to the jail," and he "[could not] offer [Whipple] any phone calls." See id. at 4. Whipple responded, "I was going to -- because my dad said something, he was going to try to get a lawyer yesterday." Id. at 4. Kettell replied, "Well, . . . we're at the adult jail. [I]t's purely up to you what you do right now." Id. He asked Whipple if he had any questions about his rights. Id. Whipple responded that he did not. Id. Kettell then asked Whipple to initial each line to show that he understood the corresponding right, but added that Whipple should not initial it if he has a question about the sentence. Id. at 5. Whipple responded that he "[doesn't] know much about [his] rights." Id. Kettell asked Whipple if he would like them read again. Id. Whipple responded, "No. I can do it." Id. Whipple proceeded to initial each sentence. Id.

Whipple conveyed an understanding of his rights and, at Kettell's request, read out loud the waiver of rights section of the advice of rights form. Ex. 11 at 5–6. Kettell then asked if he was "willing to talk . . . without a lawyer present." Id. at 6. Whipple responded by asking, "Uh, like can I talk to you now and then like later have a lawyer come?" Id. Kettle replied, "No. Right now is - - we're just going to - - we can talk right now and you have a right to have a lawyer but you don't have to. And that's totally up to you." Id. Whipple stated that he would talk and signed

3

the waiver of rights. Id. at 6; Ex. 6. Throughout the interview that followed, Whipple made several inculpatory statements, including how he had smoked a "doobie" and drank almost two full beers plus a shot of whiskey in the hours preceding the accident. Ex. 6 at 10, 12, 23–25.

A couple of months later, RSTLE received Whipple's blood test results from the South Dakota Public Health Laboratory. Ex. 3 at 22; Ex. 4 at 1. The results indicated the presence of 2.0 ng/mL of Delta 9-THC, 50ng/mL of Carboxy THC, 12 ng/mL of morphine, and a blood alcohol content of 0.082 %. Ex. 4 at 1–2.

Whipple was indicted on one count of Involuntary Manslaughter for the death of the five-year-old boy. Doc. 1. Following his indictment, Whipple moved to suppress the May 28, 2022 blood sample, as well as the statements Whipple made to Kettell during the May 29, 2022 interview. Doc. 27. Magistrate Judge Mark A. Moreno conducted a suppression hearing on September 13, 2023, and issued a Report and Recommendation, Doc. 46, recommending this Court deny Whipple's motion. Whipple now objects to that Report and Recommendation. Doc. 47.

## II.  Standard of Review

This Court reviews a report and recommendation under the statutory standards found in 28 U.S.C. § 636(b)(1), which provides that "[a] judge of the [district] court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."

## III.  Legal Analysis

### A. The Blood Draw

Whipple objects to the Report and Recommendation's conclusion that he voluntarily consented to the blood draw, arguing that his head injury, alcohol consumption, THC ingestion, and medically-administered morphine made him unable to voluntarily consent to a blood draw.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. An intrusion into the body to obtain a blood sample constitutes a Fourth Amendment search. Skinner v. Ry. Lab. Executives' Ass'n, 489 U.S. 602, 616 (1989); see also Dodd v. Jones, 623 F.3d 563, 569 (8th Cir. 2010) (noting that "a search is completed upon the drawing of [] blood"). As a rule, and subject to certain exceptions, the Fourth Amendment proscribes as unreasonable all searches conducted without the prior approval of a judge or magistrate. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). One such exception, however, is valid consent by the subject of the search. See United States v. Espinoza, 885 F.3d 516, 523 (8th Cir. 2018) ("A search conducted pursuant to a valid consent is constitutionally permissible." (citation omitted)). "An officer with consent needs neither a warrant nor probable cause to conduct a constitutional search." United States v. Pennington, 287 F.3d 739, 746 (8th Cir. 2002) (quoting United States v. Jenkins, 92 F.3d 430, 436 (6th Cir. 1996)).

Consent must be voluntary to be valid. Valid consent is consent that is "freely and voluntarily given, and not the product of implicit or explicit coercion." United States v. Castellanos, 518 F.3d 965, 969 (8th Cir. 2008) (citation omitted). "The government bears the burden of proving voluntary consent." United States v. Quintero, 648 F.3d 660, 667 (8th Cir. 2011) (citation omitted). "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." Bumper v. Norther Carolina, 391 U.S. 543, 548 (1968) (citation omitted). "In each case, the question is one of mental awareness so that the act of consent was the consensual act of one who knew what he was doing and had reasonable appreciation of the nature and significance of his actions." Castellanos, 518 F.3d at 969 (citation omitted). Yet, whether consent was voluntarily

given does not turn on a defendant's subjective state of mind. Espinoza, 885 F.3d at 523. Rather, the issue turns on whether an "officer reasonably believed the defendant consented." Id. The Government "only need[s] to prove that it was reasonable [for Kettell] to believe that [Whipple's] consent was not the result of 'duress or coercion, express or implied.'" Id. (quoting United States v. Cedano-Medina, 366 F.3d 682, 688 (8th Cir. 2004)). In evaluating whether an officer's belief was reasonable, a court must consider certain factors concerning the individual who allegedly consented to the search:

> (1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of [his or her] Miranda rights; and (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals.

United States v. Golinveaux, 611 F.3d 956, 959 (8th Cir. 2010) (quoting United States v. Arciniega, 569 F.3d 394, 398 (8th Cir. 2009)). A court should also consider factors relating to the environment in which consent was obtained:

> (1) the length of the detention; (2) whether the police used threats, physical intimidation, or punishment to extract consent; (3) whether the police made promises or misrepresentations; (4) whether the individual was in custody or under arrest when consent was given; (5) whether the consent was given in public or in a secluded location; and (6) whether the individual stood by silently or objected to the search.

United States v. Dunning, 666 F.3d 1158, 1165 (8th Cir. 2012) (quoting United States v. Quintero, 648 F.3d 660, 667 (8th Cir. 2011)). Whipple's objection argues that the Report and Recommendation overlooked his head injury and the presence of morphine in his blood in its voluntariness analysis. Doc. 47 at 1–3.

As to the head injury, the Report and Recommendation's analysis discusses Whipple's head laceration, the circumstances leading to the laceration, and the fact that the laceration required medical attention. Doc. 46 at 5–6. And as expressed in the Report and Recommendation, id., the

evidence from the suppression hearing does not support Whipple's argument that the head injury rendered him incapacitated and incapable of giving voluntary consent, Doc. 47 at 2–3. Contrary to Whipple's assertion, the evidence shows he was attentive during his conversation with tribal police, effective in his communication, and capable of making independent decisions. ST at 24–25; see also Ex. 3 at 21 ("Jiles was awake and alert."). His hospital records document that he was alert, oriented as to time and place, and capable of giving information and obeying multi-part requests and commands. Ex. 5 at 3. The hospital report states, "Patient answers every question without difficulties." Id. at 4.

Even so, Whipple argues that his consent was not voluntary because his incapacitation was evidenced through an alleged absence of physical stability. Whipple points to Marrufo's body camera footage, which recorded Marrufo transferring Whipple from the hospital to the Adult Correctional Facility. Ex. 5. In the recording, Whipple can be heard asking, "Can I lean on you?" while walking from the hospital to Marrufo's patrol vehicle. See ST at 18–19; see also Ex. 9 at 5. Although Whipple ultimately walked to the car without any assistance, he argues that the Report and Recommendation should have considered this exchange as evidence of incapacitation and the inability to consent voluntarily. Doc. 47 at 2. Whipple's argument here is flawed in two key respects.

First, there is no evidence that Whipple's request to lean on Marrufo was a symptom of impaired cognitive function. Whipple's hospital records show he suffered only minor injuries. And there is no evidence tending to show that those minor injuries impaired his cognition such that he could not make a free and voluntary decision to consent to the blood draw.

Second, even if Whipple's request to lean on Marrufo when leaving the hospital was some evidence of an impaired ability to make a free and voluntary decision to consent, the circumstances

still render it reasonable for Kettell to believe Whipple voluntarily gave consent. Voluntariness is determined by considering circumstances present at the time consent is given. See generally United States v. Quintero, 648 F.3d 660, 668 (8th Cir. 2011) (Courts are "tasked with examining the environment in which the consent took place."). After all, Whipple's request to lean was made to Marrufo, not Kettell, and made more than two hours after Whipple consented to the blood draw. See generally United States v. Turner, 157 F.3d 552, 556 (8th Cir. 1998) (noting that a change in mental condition not present when the defendant waived his rights, does not affect the validity of the waiver).

    Whipple also objects to the Report and Recommendation's failure to mention the presence of morphine in addition to alcohol and THC in his blood sample. Doc. 47 at 2. Though not mentioning the presence of morphine in Whipple's blood, the Report and Recommendation evaluated Whipple's behavior when he consented to the blood sample and his ability to consent. Doc. 46 at 5–7. Although a factor in the voluntariness analysis is whether an individual is intoxicated or under the influence of drugs, Golinveaux, 611 F.3d at 959, "the mere fact that one has taken drugs, or is intoxicated, or mentally agitated, does not render consent involuntary," Castellanos, 518 F.3d at 969 (citation omitted). Notwithstanding the presence of drugs and alcohol in his system, the relevant question remains whether Whipple had a "reasonable appreciation of the nature and significance of his actions," and "whether his conduct would have caused a reasonable person to believe that he consented." Id. at 969–70.

    After a de novo review of the evidence, this Court finds ample evidence that Whipple was (and clearly appeared to Kettell to be) alert, communicative, and "answer[ing] every question without difficulties." Ex. 5 at 4. Nothing in Whipple's behavior would indicate a lack of appreciation for the nature of his actions. ST at 24; Ex. 3 at 21; Ex. 5 at 3. To the contrary, Kettell

told Whipple why he wanted a blood sample and informed him that he did not have to consent to one. ST at 24. And the next day, Whipple recalled his interaction with Kettell and remembered consenting to the blood sample even though he did not have to. Ex. 11 at 22. Whipple voluntarily consented to the May 28, 2022 blood draw.

### B. Fifth Amendment Miranda Rights

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. To protect this right in the face of the coercive pressures of police interrogations, the Supreme Court of the United States instituted the Miranda warnings as a prophylactic safeguard tailored to ensure that an in-custody defendant's statements to law enforcement result from free choice and voluntary waiver of Fifth Amendment rights. Miranda v. Arizona, 384 U.S. 436, 444 (1966). In custodial interrogations, police must inform suspects of their Miranda rights before questioning may begin. Id. If police fail to do so, the prosecution may not use any of the suspect's statements from the interrogation. Id.

After receiving the Miranda warnings, a suspect may choose to waive those rights. Id. But the waiver must be knowing, voluntary, and intelligent. Id. "[A] valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was . . . eventually obtained." Id. at 475. In Edwards v. Arizona, the Supreme Court added a second layer of prophylaxis. 451 U.S. 477, 484–85 (1981). To prevent police from pressing suspects into waiving their Miranda rights, the Court held that a valid waiver cannot be established by showing that a suspect continued to respond to police questioning after invoking the right to have an attorney present. Id. at 484. Once a suspect invokes the right to counsel, questioning must altogether cease until an attorney has been made available or until the suspect "himself initiates further communication, exchanges, or conversations with police." Id. at 484.

1. **Miranda Right to Counsel**

Whipple moved to suppress the May 29, 2022 interview with Kettell, arguing that Kettell violated his Fifth Amendment right to remain silent by continuing to question him after he asked Kettell, "Can I talk to you now and then like later have a lawyer come?" which he claims invoked his right to counsel under Miranda. The Report and Recommendation disagreed. Whipple objects to that conclusion.

As stated above, once a suspect invokes the Miranda right to counsel, Edwards requires police to cease questioning the suspect "until a lawyer has been made available or the suspect himself reinitiates conversation" with police. Davis v. United States, 512 U.S. 452, 458 (1994) (citing Edwards, 451 U.S. at 484–85. Yet Edwards only applies if a suspect "*actually invoked* his right to counsel." Davis, 512 U.S. at 458. Whether a suspect has indeed invoked that right is an objective inquiry: a "suspect must unambiguously request counsel." Id. at 459. As the Supreme Court stated in Davis, "a statement either is such an assertion of the right to counsel or it is not." Id. (citation omitted). When a suspect's reference to an attorney is "ambiguous or equivocal," meaning "the suspect *might* be invoking the right to counsel," Edwards "do[es] not require the cessation of questioning." Id. Therefore, the question becomes whether Whipple had articulated his "desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Id.

This Court agrees with the Report and Recommendation; Whipple's question to Kettell asking, "Can I talk to you now and then like later have a lawyer come?" was not an unambiguous or unequivocal request for counsel that would have required Kettell to cease questioning under Edwards. As the Supreme Court stated in Davis, a statement either asserts the right to counsel or it does not. 512 U.S. at 459. Whipple's question does not. Whipple's reference to obtaining a

lawyer later is ambiguous, and law enforcement need not stop an interrogation based on a reference that is ambiguous or equivocal. Id. at 459–60. Nor is law enforcement under an obligation to seek clarification from a suspect who makes an ambiguous reference to counsel. Id. at 460–62 (declining "to adopt a rule requiring officers to ask clarifying questions"). On the evidence here, an officer faced with the same circumstances as Kettell reasonably could have understood Whipple's statement to be an inquiry about his ability to have a lawyer at some future time, rather than a clear and present invocation of his right.

Whipple contends, however, that two prior cases from this Court—United States v. Ziegler, 3:17-CR-30074, 2017 WL 6613404 (D.S.D. Nov. 29, 2017) and United States v. Smith, No. 3:07-CR-30097, 2008 WL 650450 (D.S.D. Feb. 15, 2008)—support his claim that he unequivocally invoked his right to counsel. His reliance on these cases is misplaced. Unlike here, the defendant in Ziegler made an unambiguous statement that he cannot talk without a lawyer present, and the arresting officer reasonably understood that as an invocation of his right to counsel. 2017 WL 6613404, *1, 4–5. In Ziegler, police conducted a traffic stop of a homicide suspect. Id. at *1. During the traffic stop, police began asking questions about the homicide. In response, the defendant stated, "I can't even talk to you guys without a lawyer." Id. The defendant was then arrested for DUI. Id. The next day, an FBI special agent interviewed the defendant at the jail. Before the interview, officers informed the special agent that the defendant had invoked his right to counsel. Id. The special agent assumed the defendant's invocation pertained only to the DUI and not to the homicide, so the agent proceeded with the interview, which resulted in the defendant making inculpatory statements. Id. Magistrate Judge Moreno recommended that the defendant's interview with the special agent be suppressed because the arresting officers understood the defendant to have invoked his right to counsel and communicated that information to the special

agent. Id. at *4–5. By reinitiating a custodial interrogation without counsel present, the special agent violated Edwards's Fifth Amendment protections. See id. at 2–3. After neither party objected to the Report and Recommendation, this Court reviewed it for clear error, found none, and adopted it. United States v. Ziegler, 3:17-CR-30074, 2017 WL 6558583 (D.S.D. Dec. 22, 2017).

Whipple's reliance on Smith is just as unavailing. In Smith, the defendant was arrested for attempt to commit sexual assault. 2008 WL 650450, *1.[1] Officers read the defendant his Miranda rights in route to the police station but did not ask him any questions. Id. at *2. Once in the booking area, the defendant was again read his Miranda rights from an advice of rights form. Id. The defendant initialed each of the rights on the form and signed a waiver of rights. Id. The defendant was then placed in a jail cell. Id. After more than 10 hours, two law enforcement officers met with the defendant. Id. After the officers introduced themselves, the defendant stated, "Can I get a lawyer here?" Id. One of the agents answered, "Sure you can." Id. Rather than stop the interrogation, the officers re-Mirandized the defendant and proceeded to ask him questions. Id. In a Report and Recommendation, Magistrate Judge Moreno recommended this Court grant the defendant's motion to suppress because his statement to police, "Can I get a lawyer here?" was very similar to the request "Can I have a lawyer?," which other courts have found to be an unequivocal invocation of the right to counsel. Id. at 4. See, e.g., United States v. Lee, 413 F.3d 622, 625–26 (7th Cir. 2005). Cf. Dormire v. Wilkinson, 249 F.3d 801, 805 (8th Cir. 2001) (holding that "Could I call my lawyer?" was not an unambiguous request for counsel). Unlike Smith's statement "Can I get a lawyer here?," Whipple's statement, and its surrounding circumstances,

---

[1] The Smith decision Whipple cites is a Report and Recommendation that was denied as moot after the defendant pleaded guilty. Accordingly, this Court never adopted its conclusions or reviewed its merits. Thus, it is not bound by its conclusion.

lacked the clear implication of a present desire to consult counsel that is characteristic of an unequivocal request for counsel.

### 2. Voluntary Waiver of Miranda

Next, Whipple objects to the Report and Recommendation's conclusion that he knowingly, voluntarily, and intelligently waived his Miranda rights. Doc. 47 at 9. It is undisputed that Kettell advised Whipple of his Miranda rights before questioning and that Whipple waived his Miranda rights by signing the waiver of rights portion of the advice of rights form. Ex. 12 at 3, 5–6; Ex. 6. The issue here is whether his waiver was "knowing, voluntary, and intelligent." Thai v. Mapes, 412 F.3d 970, 977 (8th Cir. 2005).

> A waiver is 'knowing and intelligent' where it is made with full awareness of both the nature of the right being abandoned and the consequences of abandoning the right, and a waiver is 'voluntary' where the court can determine that the waiver was a product of the suspect's free and deliberate choice, and not the product of intimidation, coercion, or deception.

Id. (citing Moran v. Burbine, 475 U.S. 412, 421 (1986)). That is, the inquiry over whether a suspect's waiver of his Miranda rights was valid has "two distinct dimensions":

> First, the waiver 'must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.' Second, the suspect must have waived his rights 'with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'

United States v. Vinton, 631 F.3d 476, 483 (8th Cir. 2011) (internal citations omitted) (quoting Moran, 475 U.S. at 421). Courts consider the totality of the circumstances when determining whether a suspect's waiver is valid. Id.

The evidentiary hearing and the recording of Kettell's interview of Whipple provide ample proof that Whipple's waiver of his Miranda rights was voluntary. The tone and overall atmosphere of the reading of the Miranda warnings and the subsequent interview was not hostile or coercive.

Id. Whipple faced neither promises nor the exertion of undue influence, pressure, or threats. Id.; see Ex. 11. The interview lasted only about 37 minutes. See Ex. 10.

Nor does the evidence suggest that Whipple waived his Miranda rights unknowingly or unintelligently. "The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver" for it to be knowing and intelligent. Colorado v. Spring, 479 U.S. 564, 574 (1987). Rather, "[t]he Miranda warnings ensure that a waiver . . . is knowing and intelligent by requiring that the suspect be fully advised" as to what those rights are. Id. Once a suspect has been advised of his Miranda rights, and the consequences of abandoning those rights (for example, being advised that what you say can and will be used against you in court), the later waiver of them will be considered knowing and intelligent. Moran, 475 U.S. at 422–23; see also United States v. Garlewicz, 493 F.3d 933, 936 (8th Cir. 2007) (citation omitted) (discussing defendant's waiver of his Miranda rights but referencing the Sixth Amendment right to counsel). At the time of the interview, Whipple was 18 years old with an eleventh-grade education. See United States v. Makes Room for Them, 49 F.3d 410, 415 (8th Cir. 1995) (holding defendant's waiver valid even though defendant had a "lower than average intelligence with only an eighth grade education"). He expressed no issues speaking or understanding the English language and appeared to understand all of Kettell's questions. Indeed, throughout the interview, he provided appropriate and comprehensible responses to all questions. When asked whether his injuries would impact his ability to talk with Kettell, Whipple ensured they would not, indicating that he was under no physical or mental impairment. Ex. 11 at 3.

Kettell then read Whipple the advice of rights form point-by-point, asked him several times whether he had any questions, and told him to initial next to each right only if he understood them. Ex. 11 at 3; ST at 35. When Whipple expressed concern about not knowing "much" about his

rights, Kettell redirected him to the advice of rights form and offered to read them again, but Whipple responded, "I can do it." Ex. 11 at 5. Whipple proceeded to initial the advice of rights form next to each right, indicating he understood them. Ex. 6; ST at 37. He then read out loud a paragraph pertaining to the waiver of his rights, which he also signed, expressing his willingness to answer questions without a lawyer present. Ex. 11 at 6; Ex. 3 at 19. At no point during the interview, which was recorded and which this Court has reviewed, did Whipple sound confused or unable to understand what Kettell was asking him. Ex. 10. Based on the totality of the circumstances, Whipple's waiver of his Miranda rights was knowing, intelligent, and resulted from a free and deliberate choice.

### C. Voluntariness of Statement

"Cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare." Vinton, 631 F.3d at 483–84 (quoting Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984)). Still, Whipple contends that Kettell's conduct during the interview, when combined with Whipple's physical condition, resulted in an involuntary statement.

"A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004) (citation omitted). The same analysis for whether a defendant's waiver of his Miranda rights was voluntary applies to determine the voluntariness of a defendant's statement under the Fifth Amendment. Makes Room for Them, 49 F.3d at 414 ("We review waivers of both [Miranda rights and the Fifth Amendment] under the same standard."). This Court has already concluded that the overall atmosphere of the interview was not hostile or coercive and that there is no evidence Kettell

threatened or intimidated Whipple. And Kettell's responses to Whipple's question about calling his dad or having a lawyer come later does not alter this conclusion.

In any event, "[t]he mere fact that an officer may have elicited a confession through a variety of tactics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices, does not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne." United States v. Boslau, 632 F.3d 422, 428–29 (8th Cir. 2011) (citations and internal quotation marks omitted); see also United States v. Aldridge, 664 F.3d 705, 713 (8th Cir. 2011) (police-dominated atmosphere and use of deceptive interview tactics "not enough" to show that the defendant's statement was involuntary); United States v. Leon Guerrero, 847 F.2d 1363, 1366 n.1 (9th Cir. 1988) (noting that "[i]f the test was whether a statement would have been made but for the law enforcement conduct, virtually no statement would be deemed voluntary because few people give incriminating statements in the absence of some kind of official action"). Based on the circumstances of this case and Eighth Circuit precedent, this Court concludes that Whipple's will was not overborne and his statements were voluntary.

Based on the above analysis, the Report and Recommendation, and all the files, records, and proceedings relevant hereto, it is hereby

ORDERED that Defendant Jiles Whipple's objections to the Report and Recommendation, Doc. 47, are overruled and the October 5, 2023 Report and Recommendation, Doc. 46, is adopted. It is further

ORDERED that Defendant Jiles Whipple's Motion to Suppress, Doc. 27, is denied.

DATED this 12th day of December 2023.

BY THE COURT:

_____
ROBERTO A. LANGE
CHIEF JUDGE